UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| COURTNEY MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00377-JAW |
| | ) | |
| INTERCOAST CAREER | ) | |
| INSTITUTE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST TO STRIKE

After concluding that the Defendant, which ran a nursing school, was not a state actor, the Court grants the Defendant's motion for summary judgment as to the counts based on 42 U.S.C. § 1983, denies the Defendant's motion to strike as being in violation of the District's local rules, and retains the remaining breach of contract count for trial under its diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## I.     PROCEDURAL BACKGROUND

On September 23, 2014, Courtney Mason filed a complaint in this Court against InterCoast Career Institute (InterCoast), containing five counts: (1) retaliation under the Maine Whistleblowers' Protection Act, (2) breach of contract, (3) retaliation under the False Claims Act, (4) First Amendment retaliation, and (5) Due Process retaliation. *Pl.'s Compl. for Breach of Contract, Retaliation, and Violation of Due Process* (ECF No. 1) (*Compl.*).  On March 4, 2015, the Court granted in part and denied in part InterCoast's motion to dismiss, dismissing Count I (the Maine

Whistleblowers' Protection Act count) and Count III (the False Claims Act retaliation count), but denying the motion as to the remaining counts. *Order on Def.'s Mot. to Dismiss and Mot. for More Definite Statement* (ECF No. 13).

After the completion of discovery, the Court held a Local Rule 56(h) pre-filing conference on May 27, 2016. *Min. Entry* (ECF No. 57). On October 18, 2016, InterCoast filed a motion for summary judgment and a statement of undisputed material facts. *Def. Intercoast Career Inst.'s Mot. for Summ. J.* (ECF No. 71) (*Def.'s Mot.*); *Def.'s Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 72) (DSMF). On November 16, 2016, Ms. Mason filed a memorandum of law in opposition to InterCoast's motion for summary judgment, a responsive statement of material facts, and an additional set of material facts. *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 73) (*Pl.'s Opp'n*); *Pl.'s Opp'n to Def.'s Statement of Undisputed Material Facts* (ECF No. 74) (PRDSMF); *Pl.'s Statement of Material Facts* (ECF No. 75) (PSAMF). On December 2, 2016, InterCoast filed a reply memorandum and a reply statement of facts. *Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 79) (*Def.'s Reply*); *Def.'s Objs. and Resps. to Pl.'s Statement of Material Facts Contained in Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 80) (DRPSAMF). On December 2, 2016, InterCoast also filed a motion to strike certain portions of Plaintiff's evidence. *Def.'s Objs. To Pl.'s Evid. Contained in Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 81) (*Def.'s Strike Mot.*). On December 16, 2016, the Plaintiff responded to Defendant's motion to strike. *Pl.'s Opp'n to Def.'s Obj. to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 83) (*Pl.'s Strike Opp'n*).

## II.    STATEMENT OF FACTS

### A.    Courtney Mason and InterCoast

InterCoast is a private closely-held California corporation that previously operated a private for-profit Vocational Nursing School in Kittery, Maine from approximately December 2010 to May 2015.  DSMF ¶ 1; PRDSMF ¶ 1.  Courtney Mason was a student at InterCoast at its Kittery, Maine location.  PSAMF ¶ 75; DRPSAMF ¶ 75.  Courtney Mason attended the Kittery Nursing School from October 29, 2012, when her participation in the Vocational Nursing Program commenced, to November 27, 2013, when she was terminated from the Vocational Nursing Program.  DSMF ¶ 2; PRDSMF ¶ 2.  Ms. Mason began taking classes in October 2012 with about forty other students.  PSAMF ¶ 76; DRPSAMF ¶ 76.

InterCoast's Kittery Nursing School had a disciplinary policy that was contained in the Student Handbook.  DSMF ¶ 11; PRDSMF ¶ 11.  Under the Student Handbook, a student has the right to appeal the School's discipline to a Disciplinary Committee composed of employees of the Kittery Nursing School and/or InterCoast.  DSMF ¶ 12; PRDSMF ¶ 12.  No governmental officials, including agents or employees of the Maine State Board of Nursing (BON), are members of the Disciplinary Committee and none participated in or presided over such appeals.  DSMF ¶ 13; PRDSMF ¶ 13.

### B.    The Maine Board of Nursing's Regulation of Nursing Programs and Nursing Students

On March 18, 1915, the Maine Legislature, through the power invested in it by the people of the state of Maine, voted approval of an "act to create a Board of

Examination and Registration of Nurses"; this was known as Chapter 139, public laws of 1915, and thus began what is today known as the BON. PSAMF ¶ 1; DRPSAMF ¶ 1.[1] Many of the functions required of that first Board continue today, in modified form, as does the basic philosophy expressed over fifty years ago that minimum requirements for schools and nursing were necessary in order to ensure the eligibility of their graduates for licensure in Maine and other states. PSAMF ¶ 2; DRPSAMF ¶ 2.[2] To quote from the original document, "this is just to the pupil and a

---

[1]     InterCoast objected to Plaintiff's statement of material fact paragraph one:

> Defendant does not dispute that Maine State Board of Nursing was created by Legislative Act and regulates Nurses and Nursing Schools. Defendant also concedes the right of the BON to regulate nurses and a nursing school within the scope of the following 2-23 statements (which are not facts, but statement of rules). However, Defendant objects to the Loranger Declaration generally and specifically in Statements 2-23, 25-74, 77-81, and 84-85 because of their failure to authenticate or establish facts or matters with competent or admissible evidence.

DRPSAMF ¶ 1.

    Under Local Rule 56(c), a party filing an opposing statement must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each statement shall begin with the designation 'Admitted,' 'Denied,' or 'Qualified' and, in the case of an admission, shall end with such designation." D. ME. LOC. R. 56(c).

    InterCoast's response to Plaintiff's statement of material fact paragraph one does not comply with Local Rule 56(c). InterCoast did not state whether it was admitting, denying or qualifying its response, and to the extent the assertion is denied or qualified, InterCoast does not support the denial or qualification with record support. In fact, InterCoast made no specific reference to the contents of the Plaintiff's asserted fact. The Court deems the statement admitted. As to InterCoast's objection to the reference to the Maine State Board of Nursing's regulations, the Court addresses this objection in footnote 2.

[2]     InterCoast objected to the first two sentences of Plaintiff's statement of material fact paragraph two:

> This is not a "fact" but a purported statement of a rule or regulation. Defendant objects to this statement as without foundation, improper opinion, and without personal knowledge or authentication, and that it is irrelevant to the question of State Action.

DRPSAMF ¶ 2. This response does not comply with Local Rule 56(c) and the Court deems the objection waived. Nevertheless, the Court will respond to InterCoast's specific objections.

    Turning to its motion to strike, Intercoast objected to and moved to strike paragraph two of the Declaration of Guy Loranger in support of Plaintiff's statement of material fact paragraph two in its entirety as follows:

"Exhibit 1 is a true and correct copy of Chapter 7 of the Department of Professional and Financial Regulations for the State Board of Nursing for Standards for Educational Programs in Nursing." Grounds: Objection, lack of foundation, lack of personal knowledge per Federal Rule 602, improper hearsay per rules 801 and 802, lack of authentication under Rule 901, absence of a Certified Public Record or authenticating testimony under Rule 902(2) or 1005. The alleged evidence is also objected to as irrelevant, per Federal Rules 401 and 402.

*Def.'s Strike Mot.* at 3. InterCoast's separately filed motion to strike does not comply with Local Rule 56(e). D. ME. LOC. R. 56(e) ("Motions to strike statements of fact are not allowed"). The Court need not consider the motion to strike because it violates the local rules; nevertheless, the Court will address the specific objections.

Here, the Plaintiff elected to posit in her statement of additional material facts portions of regulations of the state of Maine Department of Professional and Financial Regulation addressing the Standards for Educational Programs in Nursing. A copy of the Regulations is attached as Exhibit Number 1 to the Plaintiff's Statement of Additional Material Facts. *See* PSAMF Attach. 2, *Dep't of Prof'l and Fin. Reg.*, *State Bd. of Nursing*, *Standards for Educ. Programs in Nursing* at 1-18.

The Court does not view InterCoast's quibbles as having been made in good faith. Under *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22 (1st Cir. 2002), the extent of state regulation is a factor to assess in evaluating the applicability of the entwinement doctrine. *Id.* at 28. The State Board of Nursing regulations, as InterCoast concedes, are state promulgated regulations. They are similar to the Code of Federal Regulations. To present her argument that the degree of state regulation in Maine satisfies the requirements for state action, Ms. Mason properly asserted the allegedly applicable regulations in her statement of material facts. If InterCoast contended that a particular regulation was inaccurately cited, was not in effect at relevant times, or was not applicable to it or Ms. Mason, it could have posited an objection. Otherwise, it should have admitted the accuracy and applicability of the regulation.

Second, the evidentiary objections are manifestly frivolous. If the regulations required authentication, the Plaintiff has satisfied Federal Rule of Evidence 901(a) by submitting Attorney Loranger's sworn declaration that the regulations are what the Plaintiff purports them to be. FED. R. EVID. 901(a). All that Rule 901(b)(1) requires for authentication is testimony of a witness with knowledge that "an item is what it is claimed to be." FED. R. EVID. 901(b)(1). Thus, the lack of foundation, lack of personal knowledge, and authentication objections are frivolous. Similarly, state regulations fit within an exception to the hearsay rule. FED. R. EVID. 803(8). The relevancy objection is overruled.

Third, the Court is confounded by InterCoast's position. Nowhere does InterCoast claim or could it claim that the BON regulations the Plaintiff attached are not, in fact, an accurate copy of the true BON regulations in effect at relevant times in the state of Maine. If the Court sustained this objection, it would grant Attorney Loranger time to obtain a certified copy of the same regulation through the state of Maine Department of the Secretary of State, Administrative Procedures Act Office in Augusta, Maine to allow the Court to reach the issue raised by InterCoast's motion. To meet InteCoast's objection would only result in needless delay and expense.

The Court rejects InterCoast's objection to this paragraph and to paragraphs 3-23, 25-74, 77-81, and 84-85 as improperly asserted under the Local Rules of this District and frivolous, and DENIES InterCoast's motion to strike this paragraph and paragraphs 3-23, 25-74, 77-81, and 84-85 as improperly filed under the Local Rules of this District and frivolous.

Finally, the Court notes that Local Rule 83.1 requires that a visiting lawyer "shall have at all times associated with him/her a member of the bar of this Court, upon whom all process, notices and other papers may be served and who shall sign all papers filed with the Court." D. ME. LOC. R. 83.1(c)(1). InterCoast's filings in this motion for summary judgment violated this local rule as well as they were not signed by local counsel. A primary purpose of the requirement of local counsel is so that

protection to the public." *Id.* The current authorization for the BON is found in Title 32, Maine Revised Statutes, Chapter 31, as amended in 1983. *Id.*

The standards for Education Programs for Nursing are set forth in Chapter 7 of the Department of Professional and Financial Regulation for BON. PSAMF ¶ 3; DRPSAMF ¶ 3. The Standards require an institute seeking to have a nursing program to first receive Initial Approval from the BON. PSAMF ¶ 4; DRPSAMF ¶ 4. The Standards require that after Initial Approval has been granted, the institute must appoint a qualified nurse administrator. PSAMF ¶ 5; DRPSAMF ¶ 5. The Standards require that at least four months prior to the date for admission of students, the nurse administrator must provide the BON with a report on the proposed program. PSAMF ¶ 6; DRPSAMF ¶ 6. The BON will then conduct a site visit to the institute which, along with the report from the nursing administrator, shall constitute the basis for the BON to grant initial approval. PSAMF ¶ 7; DRPSAMF ¶ 7. Initial approval will be for a period established by the BON of not less than two years and if the institute meets the standards established by the BON, then Continuing Approval shall be granted as required by 32 M.R.S. § 2153(4). PSAMF ¶ 8; DRPSAMF ¶ 8.

The institute must provide the BON with any anticipated change in ownership, patent of organization, or curriculum of the nursing program from a review and action

_____

local counsel will apprise the visiting lawyer of applicable local rules and the need to comply with them. The Court expects in the future that the visiting lawyer in this case will consult with the local lawyer and vice versa to assure compliance with the requirements of the local rules for the remainder of this case. Future violations of the local rules may subject the visiting and local lawyer to sanctions.

in order to ensure the continuing approval of a program. PSAMF ¶ 9; DRPSAMF ¶ 9. The BON may withdraw its approval of a nursing program pursuant to 32 M.R.S. § 2153(6) if the BON determines that said program is not maintaining the required standards. PSAMF ¶ 10; DRPSAMF ¶ 10.

The Standards set out the requirements for the Administration of the nursing institute. PSAMF ¶ 11; DRPSAMF ¶ 11. Specifically, the Standards set out (1) the minimum requirements for qualifications of the nurse administrator of the program, PSAMF ¶ 12; DRPSAMF ¶ 12, (2) the responsibilities for the nurse administrator of the nursing program, PSAMF ¶ 13; DRPSAMF ¶ 13, (3) the minimum requirements for the faculty of nursing, PSAMF ¶ 14; DRPSAMF ¶ 14, (4) the requirements for the personnel policies of the nursing program, PSAMF ¶ 15; DRPSAMF ¶ 15, (5) the acceptable teaching load, faculty responsibilities, and faculty to student ratio, PSAMF ¶ 16; DRPSAMF ¶ 16, (6) the requirements for admission of students, PSAMF ¶ 17; DRPSAMF ¶ 17, (7) the requirement that qualified applicants be admitted without regard to race, creed, ethnic origin, marital status, sex or age, PSAMF ¶ 18; DRPSAMF ¶ 18, (8) the requirement that students' rights, responsibilities and opportunities shall be available in written form and shall include student involvement in determining academic policies and procedures, curriculum planning, and evaluation of teaching effectiveness, PSAMF ¶ 19; DRPSAMF ¶ 19, (9) the requirement that policies and procedures pertaining to dismissal and withdrawal must be clearly stated and adequately safeguard the rights of both the student and the educational program and nursing, PSAMF ¶ 20; DRPSAMF ¶ 20, (10)

requirements for the curriculum of the nursing program, PSAMF ¶ 21; DRPSAMF ¶ 21, (11) requirements concerning the resource facilities and services in the local community to be used as clinical sites, PSAMF ¶ 22; DRPSAMF ¶ 22, and (12) requirements for records, reports and bulletins to be maintained by the nursing institute. PSAMF ¶ 23; DRPSAMF ¶ 23.

## C. The Maine Board of Nursing's Regulation of InterCoast's Nursing Program

In September 2007, the BON granted InterCoast permission to initiate an educational program in nursing. PSAMF ¶ 24; DRPSAMF ¶ 24. On November 2, 2007, Kelly Michaud, InterCoast's Executive Director, emailed Myra Broadway, the Executive Director of the Maine BON, inquiring whether the qualifications of prospective candidates for InterCoast's Director of the Nursing Program met BON qualifications, writing "can you offer some guidance on this? Would it make sense to consider them and then ask for final approval of the acceptance from the BON?" PSAMF ¶ 25; DRPSAMF ¶ 25.[3]

---

[3]    Each of InterCoast's responses to Plaintiff's paragraphs twenty-five through seventy-four is identical:

> Defendant disputes and objects to this statement as hearsay, without Foundation, without authentication, improper opinions and conclusions, and that it is irrelevant to the question of State Action.

DRPSAMF ¶¶ 25-74. As the Court explained in footnote one, these responses violate Local Rule 56(c) because they fail to admit, deny or qualify the asserted paragraph. Also, InterCoast is making a boilerplate evidentiary objection to each asserted fact. These twenty-five cut and paste responses violate both the letter and spirit of the Local Rules. In effect, InterCoast's identical responses place the burden on the Court to differentiate among different asserted facts to determine whether the stock evidentiary objections are meritorious. The Court will not do so. The Court concludes that InterCoast's responses violate the Local Rule and deems each asserted fact admitted.

On December 13, 2007, members of the BON made an unannounced inspection of InterCoast's South Portland campus. PSAMF ¶ 26; DRPSAMF ¶ 26. Ms. Broadway wrote a letter to Mary J. Edwards, the Interim Director of InterCoast's nursing program, summarizing the unannounced inspection. PSAMF ¶ 27; DRPSAMF ¶ 27. In the letter, Ms. Broadway wrote that the "unannounced visit was precipitated by the major and abrupt resignation of the Nursing Administrator of the Practical Nursing Program and by numerous concerns from current students and the public regarding information given to them by program representatives." *Id.* Ms. Broadway detailed several criticisms of the program. PSAMF ¶ 28; DRPSAMF ¶ 28. Ms. Broadway noted that InterCoast planned to admit four classes of sixty students per year, yet "the admission plan to admit four classes a year was never presented to the BON by the previous Nursing Director or the Campus Director." *Id.* Ms. Broadway also wrote that InterCoast had failed to hire faculty with academic experience as required by BON standards. PSAMF ¶ 29; DRPSAMF ¶ 29. Ms. Broadway made it clear that the BON required that before the admission of more classes, a clear and detailed plan for hiring faculty and arranging for clinical practice sites should be developed and submitted to the BON. PSAMF ¶ 30; DRPSAMF ¶ 30. Ms. Broadway wrote that "the rules of the Maine State Board of Nursing are very clear about faculty developing the curriculum" and that during inspection, although "the two faculty members we had the opportunity to converse with were truly dedicated and committed to the success of the students, neither could articulate the philosophy of practical nursing education, nor had they had any formal academic

experience." PSAMF ¶ 31; DRPSAMF ¶ 31. Ms. Broadway stated that "it was made clear during the visit that there are no formal faculty meetings scheduled." PSAMF ¶ 32; DRPSAMF ¶ 32. Ms. Broadway said that "when we asked to see the course evaluations the students recently completed, we were informed that no evaluations have been done." PSAMF ¶ 33; DRPSAMF ¶ 33. Ms. Broadway noted that "there seems to be a great deal of confusion regarding the purpose of this practical nursing program. Nursing programs must be informed that the intent of the program as presented to the BON is to prepare students to be practical nurses. This program does not prepare them to automatically qualify for a registered nursing program in Maine. The BON has already directed [InterCoast] that this fact must be clearly stated in writing." PSAMF ¶ 34; DRPSAMF ¶ 34. Ms. Broadway warned InterCoast that it must hire a full time nursing program administrator no later than February 1, 2008. PSAMF ¶ 35; DRPSAMF ¶ 35. Ms. Broadway also stated that "when hiring the nursing administrator and faculty, the standards provided in **Chapter 7 Standards for Educational Programs in Nursing** MUST be met." PSAMF ¶ 36 (emphasis in Broadway letter); DRPSAMF ¶ 36. Ms. Broadway closed by warning that "if all the above requirements are not met by March 3, 2008, my recommendation to the BON will be to close the program." PSAMF ¶ 37; DRPSAMF ¶ 37.

On August 18, 2008, Ms. Broadway and other members of the BON made another on-site inspection at InterCoast. PSAMF ¶ 38; DRPSAMF ¶ 38. Ms. Broadway wrote a letter summarizing the inspection and noted that InterCoast had responded to the direction of the BON. PSAMF ¶ 39; DRPSAMF ¶ 39. Ms. Broadway

also wrote that as a result of one of the concerns from the inspection, the BON directed board member Susan Baltrus to go to the River Ridge elderly care facility to view InterCoast students in a clinical setting. PSAMF ¶ 40; DRPSAMF ¶ 40. In her letter, Ms. Broadway quoted from Ms. Baltrus' report of that visit, noting that "on arrival, I was shown to the clinical area that was a clinical site for one group of students. Some students were chewing gum and one student was wearing white shorts above the knee." PSAMF ¶ 41; DRPSAMF ¶ 41. Ms. Baltrus also noted other issues, including the distribution of medication. *Id.* In summary, Ms. Broadway concluded by stating that although the Baltrus report "raises some concerns, the overall information gathered during the visit demonstrates the new program is consistent with core rules of practical nursing programs. The BON will look forward to an update from Director Brodie regarding the mentoring and evaluation of the faculty." PSAMF ¶ 42; DRPSAMF ¶ 42.

On March 31, 2009, Ms. Broadway wrote an email to BON members noting that in the first class "of [InterCoast] graduates (November 2008) seven passed the NCLEX-PN and seven failed. This program is only on a temporary/provisional approval — and may be worth a telephone conference call among us to determine what should be the next step." PSAMF ¶ 43; DRPSAMF ¶ 43.

On May 15, 2009, Ms. Baltrus made a site visit to view InterCoast students at the Pine Point Center and wrote that she met with the Manager of the Long Term Care Unit who cited many concerns with the students, including arriving late, leaving early, instructors and students not having a list of skills to perform, and the high

turnover with faculty.  PSAMF ¶ 44; DRPSAMF ¶ 44.  Ms. Baltrus met with students, who had many complaints, including no "real world" experience, policies regarding academic probation not consistently followed, and the lack of hours for lecture and theory.  PSAMF ¶ 45; DRPSAMF ¶ 45.  On June 4, 2009, the BON reviewed InterCoast's request for full approval of the practical nursing program and denied the request based in part on the clinical site reports by Ms. Baltrus.  PSAMF ¶ 46; DRPSAMF ¶ 46.

In a letter dated October 12, 2010, the BON granted full approval for InterCoast's Practical Nursing Program.  PSAMF ¶ 47; DRPSAMF ¶ 47.  The BON approval was effective December 1, 2010.  DSMF ¶ 3; PRDSMF ¶ 3.[4]  In order to obtain such approval, InterCoast was required to provide certain documents to the BON, including its proposed educational program and curriculum.  DSMF ¶ 4; PRDSMF ¶ 4.  Without a license to operate the Kittery Nursing School, students would not be able to sit for the examination to become a licensed practical nurse.

---

[4]      Ms. Mason denied that the approval took place in December 2010 or that it concerned the Kittery school.  PRDSMF ¶ 3.  The October 12, 2010 letter from Myra Broadway of the BON to Cynthia Brodie of InterCoast states that the BON Certificate of Approval will be mailed to her in December 2010 after all Board Members have signed the document.  PSAMF ¶ 47, Attach. 8, *Letter from Myra A. Broadway to Cynthia S. Brodie* (Oct. 12, 2010) (*Broadway Letter*).  InterCoast's statement of material fact paragraph three states that it received BON approval on December 1, 2010.  DSMF ¶ 3.  InterCoast's statement is confirmed by a sworn declaration signed by Geeta A. Brown, the President of InterCoast Career Institute.  *Def.'s Mot.* Attach. 1, *Decl. of Geeta A. Brown, Pres. of InterCoast Career Inst. in Supp. of Def.'s Mot. for Summ. J.* ¶ 3 (*Brown Decl.*).  Ms. Brown's sworn declaration is consistent with Ms. Broadway's October 12, 2010 letter as regards the date that InterCoast received BON approval.  The Court rejects Ms. Mason's denial and accepts the December 1, 2010 date.
        As regards whether the BON approved the Kittery location, the South Portland location, or both, Ms. Broadway's October 12, 2010 letter does not limit the BON approval to a particular site.  *Broadway Letter* at 1.  Ms. Brown's declaration states that the BON approved the Kittery location.  *Brown Decl.* ¶ 3.  The Court rejects Ms. Mason's denial and accepts InterCoast's assertion that the BON approved its Kittery site on December 1, 2010.

DSMF ¶ 5; PRDSMF ¶ 5.[5]  The BON had the authority to modify, suspend, or terminate its approval.  DSMF ¶ 6; PRDSMF ¶ 6.

The BON had the authority to receive and investigate complaints from students regarding the conduct of the Kittery Nursing School and to impose discipline upon the Kittery Nursing School after an administrative process and review in response to such complaints and for other reasons.  DSMF ¶ 7; PRDSMF ¶ 7.  At no time did any employee or agent of the BON directly participate in the management, operations, discipline, or other activities of the Kittery Nursing School.  DSMF ¶ 8; PRDSMF ¶ 8.[6]

On July 20, 2012, the BON received two anonymous complaints regarding InterCoast, each alleging issues with its practical nursing program, and on July 30,

---

[5]    Ms. Mason interposed an objection, restating her objection that the BON did not approve InterCoast's Kittery campus.  PRDSMF ¶ 5.  The Court overrules her objection for the reasons set forth in footnote 4.

Quoting from Ms. Broadway's August 2008 letter to InterCoast, which is set forth in her statement of material fact paragraph 34, Ms. Mason objects on the ground that graduation from InterCoast's Kittery school would not entitle a student to sit for the LPN examination.  PRDSMF ¶ 5.  The Court overrules her objection.  The quoted portion of Ms. Broadway's letter addresses confusion about whether students in the licensed practical nursing program will qualify them for a registered nurses program.  *See* PSAMF ¶ 34.  Ms. Broadway's letter did not refer to whether an LPN student needed to graduate from a licensed LPN school to sit for an LPN examination.

[6]    In its statement of material facts paragraph 9 and 10, InterCoast states:

> There was no intertwining of employees, facilities, or operations between the Kittery Nursing School, as a private institution, and any State or Federal Governmental Agency, Body, or Entity.

> There were no employees or agents of any State or Federal Agency which participated in the discipline of students, the discipline of employees, or in any other aspect of the conduct of the Kittery Nursing School at any time.

DSMF ¶¶ 9, 10.  Ms. Mason objected.  PRDSMF ¶¶ 9, 10.  The Court sustains the objections.  The legal issue before the Court in this motion is whether Ms. Mason has alleged sufficient facts to satisfy the entwinement doctrine.  In the context of the motion, InterCoast's statements are conclusions of law, not statements of fact.

2012, the BON sent copies of the complaints to Doreen Hunt, RN, Interim Director for InterCoast, and requested a written response. PSAMF ¶ 48; DRPSAMF ¶ 48. In response to the complaints, on July 9 through July 27, 2012, Ms. Baltrus and other BON staff conducted telephonic interviews of staff at the clinical sites affiliated with InterCoast's practical nursing program. PSAMF ¶ 49; DRPSAMF ¶ 49. In general, the interviews revealed that all clinical sites affiliated with InterCoast reported minimal paperwork (no syllabi or possibly one that was outdated), few contracts, rarely a skills checklist, and sometimes students and faculty just showing up for a new rotation without prior notice. PSAMF ¶ 50; DRPSAMF ¶ 50. On August 10, 2012, the BON received a written response from InterCoast Interim Director Doreen Hunt to the two anonymous complaints denying any issues with its practical nursing program. PSAMF ¶ 51; DRPSAMF ¶ 51.

On August 12, 2012, the BON received a letter from Cynthia Brodie, Corporate Director of Nursing Education for InterCoast, notifying the BON that Cynthia Lamontagne had been appointed as the Nursing Program Director at InterCoast based in Kittery, Maine. PSAMF ¶ 52; DRPSAMF ¶ 52. On August 22, 2012, Ms. Broadway sent Ms. Lamontagne a letter, informing her of information uncovered during an investigation regarding unacceptable behavior by students. PSAMF ¶ 53; DRPSAMF ¶ 53. Students were in the lounge watching television and doing crossword puzzles. PSAMF ¶ 54; DRPSAMF ¶ 54. The instructors thought the students were immature and unprofessional and that the students would not accept responsibility for their actions, causing Instructor A to give all the students a zero for

14

the day, emailing the grades to InterCoast administration. PSAMF ¶ 55; DRPSAMF ¶ 55. In response, all the students left early and met with the Director of Nursing at InterCoast about the zero grades issued by Instructor A. PSAMF ¶ 56; DRPSAMF ¶ 56. Instructor A was not invited to or present at the meeting, and when Instructor A asked the Director of Nursing what happened, the Director of Nursing stated that it was her role to "hear both sides." PSAMF ¶ 57; DRPSAMF ¶ 57. After this meeting, there was an InterCoast staff meeting at which Instructor A was not present because she had not been made aware of it. PSAMF ¶ 58; DRPSAMF ¶ 58. Instructor A said that nothing would happen to the students to whom she issued zero grades when they pay $35,000 a year to attend InterCoast's LPN program. PSAMF ¶ 59; DRPSAMF ¶ 59. Several students have been making negative comments about Instructor A on the internet. PSAMF ¶ 60; DRPSAMF ¶ 60. After Instructor A's discussion of this matter with the Executive Director of the BON, she called and spoke with Cynthia Brodie, Corporate Director of Nursing Education for InterCoast, and emailed the student evaluations and grades to her. PSAMF ¶ 61; DRPSAMF ¶ 61. InterCoast made several position changes while Instructor A worked for it, but InterCoast never communicated those changes to the Instructors and Instructor A had to ask more than once to whom she was supposed to report when the changes occurred. PSAMF ¶ 62; DRPSAMF ¶ 62. In response to the findings of the investigation, Ms. Brodie sent the BON a letter dated August 29, 2012 and wrote that the "concerns expressed by our clinical affiliates are justifiable and can be explained but not excused; they will be addressed by administration." PSAMF ¶ 63; DRPSAMF ¶ 63.

On September 18, 2012, the BON met with Cynthia Brodie and Kelly Michaud, InterCoast's Executive Director, regarding the pending issues and after this meeting, the BON voted to offer InterCoast a Consent Agreement to place InterCoast's LPN education program on "probationary" status in accordance with 32 M.R.S. § 2153-A(6). PSAMF ¶ 64; DRPSAMF ¶ 64. After the September 18, 2012 BON meeting, the BON's assigned legal counsel and InterCoast's legal counsel negotiated a Consent Agreement to resolve the pending matter without further proceedings. PSAMF ¶ 65; DRPSAMF ¶ 65. The Consent Agreement took effect on March 23, 2013. PSAMF ¶ 66; DRPSAMF ¶ 66.

In the Consent Agreement, InterCoast acknowledged that the BON had the discretion to place its LPN educational program on probationary status given the issues involved the oversight of faculty and students, the relationship between InterCoast and the clinical sites, and an apparent lack of structure or enforcement of structure. PSAMF ¶ 67; DRPSAMF ¶ 67. In the Consent Agreement, InterCoast admitted that it had violated subsections of BON rules in Chapter 7. PSAMF ¶ 68; DRPSAMF ¶ 68. As part of the Consent Agreement, InterCoast agreed to obtain "candidacy" status by the National League for Nursing Accrediting Commission (NLNAC) within twelve months following the execution of the Consent Agreement, to obtain accreditation of its LPN program by the NLNAC within eighteen months of achieving candidacy status, and after achieving accreditation, to maintain accreditation of the LPN program by the NLNAC. PSAMF ¶ 69; DRPSAMF ¶ 69.

InterCoast also agreed to provide the BON with (1) the pass rates of each LPN class; (2) written quarterly reports detailing the progress it was making toward acquiring candidacy status and accreditation by the NLNAC, (3) the credentials and the date of hire for all faculty, and (4) an organizational chart depicting the current relationships of authority and responsibility and channels of communication. PSAMF ¶ 70; DRPSAMF ¶ 70. In accordance with 32 M.R.S. §§ 2104 and 2153-A, InterCoast agreed to (1) submit its LPN programs to random site inspections by the BON or its agents, (2) cooperate with the BON or its agents during any random site inspections of its LPN programs, and (3) permit its faculty and students to be interviewed by the BON or its agents during any random site inspection and/or investigation of its LPN programs. PSAMF ¶ 71; DRPSAMF ¶ 71.

On August 13, 2014, the BON and InterCoast entered into a Supplemental Consent Agreement because InterCoast had not fully complied with the original Consent Agreement. PSAMF ¶ 72; DRPSAMF ¶ 72. On September 11, 2015, InterCoast notified the Maine Attorney General that it would be voluntarily discontinuing its nursing program. PSAMF ¶ 73; DRPSAMF ¶ 73. On September 17, 2015, the BON and InterCoast entered into a second amendment to the Consent Agreement in which InterCoast would discontinue its nursing program and voluntarily surrender its Certificate of Approval effective March 31, 2016. PSAMF ¶ 74; DRPSAMF ¶ 74.

### D. Governmental Involvement in InterCoast

Any student at the Kittery Nursing School interested in applying for financial aid could fill out the Free Application for Federal Student Aid and submit it to the United States Department of Education. DSMF ¶ 17; PRDSMF ¶ 17. This Financial Aid Application could be completed "online" at the Federal Student Aid Website. DSMF ¶ 18; PRDSMF ¶ 18. Based on various criteria, including income, the student might be awarded a Pell Grant (at the time up to approximately $5,775.00), an SEOG grant (typically approximately $300 per award year), a subsidized direct student loan (subsidized by the Federal Government), an unsubsidized direct student loan, and/or a Parent Plus loan for dependent students. DSMF ¶ 19; PRDSMF ¶ 19.

Neither InterCoast nor the Kittery Nursing School ever independently applied for or received federal or state student aid at any time. DSMF ¶ 21; PRDSMF ¶ 21.[7] The funds received through the student's application do/did not comprise subsidies or direct funding from any government agency but were legitimate grants and loans created by the student and for the benefit of the student. DSMF ¶ 22; PRDSMF ¶ 22.

Neither InterCoast nor the Kittery Nursing School ever employed any governmental employees, whether local, state or federal. DSMF ¶ 23; PRDSMF ¶ 23.[8] The Kittery Nursing School was not the only vocational nursing school or

---

[7]     Ms. Mason responded to InterCoast's paragraphs twenty-one and twenty-two that she "does not have information to admit or deny the fact." PRDSMF ¶¶ 21-22. InterCoast's assertions are supported by the sworn declaration of Geeta Brown, its corporate president. *See Brown Decl.* ¶ 8. The Court accepts InterCoast's statement of material facts paragraphs twenty-one and twenty-two over Ms. Mason's response.

[8]     Ms. Mason responded:

Plaintiff objects to the evidence submitted by [InterCoast] in support of the fact which is conclusory and without foundation.

program at the time that Courtney Mason could have pursued; there were multiple

other local public and private nursing schools that Ms. Mason could have applied to,

including without limitation, the Central Maine Community College, and in New

Hampshire, The Salter School of Nursing and Harmony Health Care.  DSMF ¶ 24;

PRDSMF ¶ 24.[9]  The state of Maine did not contract with InterCoast or the Kittery

Nursing School to provide vocational nursing school training.  DSMF ¶ 25; PRDSMF

¶ 25.[10]  InterCoast and the Kittery Nursing School were, at all times, run by Geeta

Brown as the President, and there has never been any person working for or employed

by any state or federal government who participated in the corporate governance,

management or control of the corporation or of the Kittery Nursing School.  DSMF ¶

26; PRDSMF ¶ 26.[11]

---

PRDSMF ¶ 23.  This is not a proper response under the local rules because it does not admit, deny or qualify the asserted fact.  D. ME. LOC. R. 56(c).  Furthermore, her objection is frivolous.  InterCoast's statement of material fact twenty-three is based on the sworn declaration of Geeta Brown, its corporate president.  *Brown Decl.* ¶ 9.  As InterCoast's president, Ms. Brown presumably knows whether it employed any government employees and her statement to that effect is not conclusory.  The Court overrules Ms. Mason's objection.

[9]      Ms. Mason responded:

> Plaintiff objects to the evidence submitted by [InterCoast] in support of the fact which is conclusory and without foundation.

PRDSMF ¶ 24.  This is not a proper response under the local rules because it does not admit, deny or qualify the asserted fact.  D. ME. LOC. R. 56(c).  Furthermore, her objection is frivolous.  InterCoast's statement of material fact twenty-four is based on the sworn declaration of Geeta Brown, its corporate president.  *Brown Decl.* ¶ 10.  As InterCoast's president, Ms. Brown presumably knows its regional competitors for students and her statement to that effect is not conclusory.  The Court overrules Ms. Mason's objection.

[10]      Ms. Mason denied this paragraph, asserting that the state of Maine and InterCoast "did contract to provide a practical nursing program through the BON's granted full approval for [InterCoast's] Practical Nursing Program and the subsequent Consent Agreements entered into by both parties."  PRDSMF ¶ 25.  The Court views InterCoast's paragraph twenty-five as claiming that the state of Maine did not pay InterCoast any money to set up and operate the nursing school.  Viewed in this way, the Court declines to accept Ms. Mason's denial as non-responsive.

[11]      Ms. Mason denied this paragraph, asserting that the BON was continually involved in the governance, management and control of InterCoast's nursing school and she incorporated in this response, her response to paragraph nine.  PRDSMF ¶ 26.  Again, the Court does not view Ms. Mason's

## E.  The BON's Involvement with Courtney Mason

InterCoast failed to provide Courtney Mason with the education, training or facilities that it had advertised and that were required by the BON.  PSAMF ¶ 77; DRPSAMF ¶ 77.[12]  Accordingly, Ms. Mason complained about the conditions to the President and Director of Nursing, but InterCoast ignored her complaints.  PSAMF ¶ 78; DRPSAMF ¶ 78.[13]  On November 23, 2013, Ms. Mason contacted the BON to complain about InterCoast.  PSAMF ¶ 79; DRPSAMF ¶ 79.[14]  On November 26, 2013, Andrea Gauntlet, the Director of Nursing at InterCoast, called Ms. Mason into her

objection as responsive.  The Court views InterCoast's paragraph twenty-six as asserting that no one from the government was employed at InterCoast in management or governance, and that InterCoast was run privately.  The fact that the BON was actively involved in regulatory oversight of InterCoast does not mean that government employees were running the corporation.  The Court rejects Ms. Mason's denial of InterCoast paragraph twenty-six.

[12]  InterCoast interposed an objection to this paragraph, stating that it was "Disputed, Objections, improper opinions, conclusions, and argumentative, no foundation, hearsay, lack of authentication, and not relevant to State Action issue."  DRPSAMF ¶ 77.  The Court disagrees.  The statement, which is based on Ms. Mason's own testimony, sets the stage for her argument about BON involvement in response to her complaints.  The Court rejects InterCoast's denial of the paragraph and overrules its evidentiary objections.

[13]  InterCoast interposed its boilerplate response to this paragraph, stating that it was "Disputed, Objections, improper opinions, conclusions, hearsay, argumentative, no foundation, lack of authentication, and not relevant to State Action issue."  DRPSAMF ¶ 78.  InterCoast's response is frivolous.  The statement is based on Ms. Mason's own knowledge.  The Court rejects InterCoast's denial of the paragraph and overrules its evidentiary objections.

[14]  InterCoast interposed its boilerplate response to this paragraph, stating that it was "Disputed, Objections, improper opinions, conclusions, hearsay, argumentative, no foundation, lack of authentication, and not relevant to State Action issue."  DRPSAMF ¶ 79.  InterCoast's response is frivolous.  The statement is based on Ms. Mason's own knowledge.  The Court rejects InterCoast's denial of the paragraph and overrules its evidentiary objections.

office to discuss her letter to the BON.  PSAMF ¶ 80; DRPSAMF ¶ 80.[15]  On November

27, 2013, InterCoast expelled Ms. Mason.[16,17]

By letter dated December 31, 2013, the BON notified InterCoast of Ms. Mason's

complaint and requested a response from InterCoast no later than February 1, 2014.

PSAMF ¶ 82; DRPSAMF ¶ 82.  In BON's December 31, 2013 letter, it requested that

InterCoast supply it with (1) a copy of all investigations into complaints by students

conducted by InterCoast staff of alleged cheating by other students on InterCoast

examinations from January 1, 2012 to the then present; (2) the identity of all

InterCoast staff members, employees or agents who conducted investigations into any

allegations of cheating by students from January 1, 2012 to the then present; (3) the

identity of all InterCoast students who have alleged cheating by students on

---

[15]  InterCoast interposed its boilerplate response to this paragraph, stating that it was "Disputed, Objections, improper opinions, conclusions, hearsay, argumentative, no foundation, lack of authentication, and not relevant to State Action issue."  DRPSAMF ¶ 80.  InterCoast's response is frivolous.  The statement is based on Ms. Mason's own knowledge.  The Court rejects InterCoast's denial of the paragraph and overrules its evidentiary objections.

[16]  Ms. Mason's full paragraph 81 reads:  On November 27, 2013, InterCoast expelled Mason in retaliation for her complaints about InterCoast to the Board of Nursing.  PSAMF ¶ 81.  InterCoast interposed its boilerplate response to this paragraph, stating that it was "Disputed, Objections, improper opinions, conclusions, hearsay, argumentative, no foundation, lack of authentication, and not relevant to State Action issue."  DRPSAMF ¶ 81.  The Court sustains a portion of InterCoast's objection; whether InterCoast was retaliating against her for complaining to the BON is a legal conclusion, and not properly subject to a factual assertion.  However, the Court has allowed so much of the paragraph as asserts that InterCoast expelled Ms. Mason on November 27, 2013.

[17]  In its statements of material fact paragraphs 14 and 15, InterCoast asserts that the BON did not direct or control the discipline of any student and specifically did not participate in the discipline of any student, including Courtney Mason.  DSMF ¶¶ 14-15.  This provoked an objection from Ms. Mason, who itemized the BON's involvement in InterCoast's disciplinary process.  PRDSMF ¶¶ 14-15.  As the Court is required to view the evidence in the light most favorable to Ms. Mason, the Court declines to accept InterCoast's factually contested paragraphs.

In its statement of material fact paragraph 16, InterCoast states that it never received any financial support from a government.  DSMF ¶ 16.  Ms. Mason objected, asserting that InterCoast would have received the proceeds from federal student aid programs.  PRDSMF ¶ 16.  As the Court is required to view the evidence in the light most favorable to Ms. Mason, the Court declines to accept InterCoast's factually contested paragraph.

InterCoast examinations from January 1, 2012 to the then present; (4) the criteria for admission to the nursing program; (5) copies of screening tools used to screen candidates; and (6) the screening process used before or after admission to identify remedial academic needs for students. PSAMF ¶ 83; DRPSAMF ¶ 83.

In January 2014, InterCoast offered to allow Ms. Mason to return to school on February 4th if:

> Mason will immediately notify the Maine Board of Nursing that School has satisfied any and all concerns contained in her complaint to the Maine Board of Nursing, and she will request in writing (via email to Myra Broadway) the withdrawal of her complaint no later than January 31, 2014 at 1:00 pm. Student has granted authorization to the School to inform the Maine Board of Nursing of her desire to withdraw her complaint. She states her issues to the Board are all resolved. <u>Student acknowledges that her agreement to notify the Maine Board of Nursing of her withdrawal of her complaint is strictly voluntary and not the result of coercion, duress, or undue influence.</u>

PSAMF ¶ 84 (underline in original document); DRPSAMF ¶ 84.[18] Ms. Mason rejected InterCoast's offer because she considered the offer further retaliation from InterCoast and it required her to admit that she was terminated for cause and not retaliation. PSAMF ¶ 85; DRPSAMF ¶ 85.[19]

---

[18]     InterCoast interposed an objection, stating that this paragraph is an "improper attempt to introduce settlement offer, settlement discussions, in violation of Federal Rule 408." DRPSAMF ¶ 84. The Court overrules InterCoast's objection. Rule 408 is not "a complete prohibition on the admissibility of settlements offers." *Stanley v. Peabody*, No. 1:10-cv-345-JHR, 2012 U.S. Dist. LEXIS 75993, at *2-3 (D. Me. May 30, 2012); *United States v. J.R. LaPointe & Sons, Inc.*, 950 F. Supp. 21, 23 (D. Me. 1996). The Rule "does not exclude use of compromise evidence when it is offered to prove something other than liability for, or invalidity of, a claim or its amount." *LaPointe*, 950 F. Supp. at 23.

   Here, Ms. Mason is offering the evidence of compromise to buttress her contention that there are sufficient facts to meet the requirements of the entwinement doctrine for purposes of state action. The contents of the quoted document are some evidence that Ms. Mason's expulsion was related to her complaint to the BON and therefore that InterCoast's actions against Ms. Mason were intertwined with BON's regulatory oversight of InterCoast. The Court overrules InterCoast's objection.

[19]     InterCoast interposed a Rule 408 objection, which the Court overrules for the same reasons set forth in footnote 18.

On September 23, 2014, Ms. Mason filed the pending lawsuit. PSAMF ¶ 86; DRPSAMF ¶ 86. InterCoast has a policy that states: "InterCoast Colleges/InterCoast Career Institute—students, faculty, staff, and administrators—has as its goal to create and sustain an anti-discriminatory environment and will not tolerate discrimination of any kind." PSAMF ¶ 87; DRPSAMF ¶ 87. InterCoast also has a policy that reads: "No employee or student shall be subjected to discharge, suspension, discipline, harassment, or any form of discrimination having in good faith utilized or assisted others in using the discrimination complaint procedures." PSAMF ¶ 88; DRPSAMF ¶ 88.

## III. THE POSITIONS OF THE PARTIES

### A. A Partial Motion

Courtney Mason's Complaint originally contained five counts: (1) Count One, retaliation under the Maine Whistleblowers' Protection Act; (2) Count Two, breach of contract; (3) Count Three, retaliation under the False Claims Act; (4) Count Four, First Amendment retaliation; and (5) Count Five, Due Process retaliation. *Compl.* at 2-4. In response to InterCoast's motion to dismiss and with Ms. Mason's consent, on March 4, 2015, the Court dismissed both Counts One and Three, leaving Counts Two, Four, and Five as Ms. Mason's remaining counts. *Order on Def.'s Mot. to Dismiss and Mot. for More Definite Statement* at 2, 10 (ECF No. 13). In its motion for summary judgment, InterCoast moved for judgment on Counts Four and Five only, acknowledging that Count Two, the breach of **contract** count, could proceed. *Def.'s*

*Mot.* at 3 ("Defendant has elected not to file a Motion for Summary Judgment as to Count II, for breach of contract").

**B.      InterCoast's Motion**

InterCoast's motion for summary judgment as to Counts Four and Five is based on its assertion that it is not a state actor and there is no state action present and therefore it is entitled to judgment on these constitutionally-based counts.  *Id.* InterCoast contends that to proceed with either constitutionally-based count, Ms. Mason must plead and prove state action.  *Id.* at 8.  Analyzing the First Circuit case of *Logiodice*, InterCoast argues that education is not an "exclusive public function" and that the degree of governmental intertwining in *Logiodice* was more extensive than the degree in this case and therefore summary judgment is appropriate here just as it was in *Logiodice*.  *Id.* at 9-11.

**C.      Courtney Mason's Response**

In her response, Ms. Mason contends that the degree of BON involvement in InterCoast's nursing school creates a question of fact about state action for jury resolution.  *Pl.'s Opp'n* at 1-2.  Also analyzing *Logiodice*, Ms. Mason comes to a different conclusion.   *Id.* at 13-16.  Ms. Mason emphasizes that the First Circuit described the state action tests as "sensitive to fact situations" and lacking a "neat consistency."  *Id.* at 14 (quoting *Logiodice*, 296 F.3d at 26).  In addition to its broad regulatory control of InterCoast, Ms. Mason argues the BON assumes direct involvement in the events that led to her expulsion.  *Id.* at 14-16.  She concludes that

there is sufficient evidence in the record to generate a triable issue of fact as to the degree of state action. *Id.* at 16.

### D. InterCoast's Reply

In its reply, InterCoast charges that Ms. Mason has "completely misunderstood or misapplied the entwinement test and has failed to raise any triable factual issues." *Def.'s Reply* at 1. It also asserts for the first time that the Court should dismiss the remaining state law claim. *Id.*

InterCoast declaims Ms. Mason's references to state regulation by the BON, arguing that the entwinement test "**has nothing to do with regulation**." *Id.* at 2 (emphasis in original). InterCoast turns to *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001) and maintains that in *Brentwood*, it was "the very action of enforcing a regulatory prohibition which was the 'State Action.'" *Id.* at 3 (citing *Brentwood*, 531 U.S. at 296). By contrast, here, InterCoast points out that the BON was not involved in Ms. Mason's termination. *Id.* Indeed, InterCoast observes that the BON and InterCoast were "in an **adversarial** relationship as to Plaintiff's termination" and such an "**adversarial**" relationship would not support 'State Action' based upon an 'Entwinement' theory, just the opposite." *Id.* at 4 (emphasis in original). InterCoast also argues that the First Circuit decision in *Logiodice* requires that the state be "intimately involved with the private institution." *Id.* at 5. It writes "[c]learly, in a factual scenario much stronger toward State Action than the case here, the First District (sic) Court of Appeal found **NO STATE ACTION**." *Id.* (emphasis in original). Regarding Ms. Mason's reliance

on the BON's extensive regulation of InterCoast, InterCoast cites *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) in which it says the United States Supreme Court expressly rejected this argument. *Id.* at 6-7. InterCoast ends by stating that the Court should grant it summary judgment on Counts Four and Five, "and dismiss the remaining Breach of Contract Action as a state law claim without continuing jurisdiction of this Court." *Id.* at 9.

## IV.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed

claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

### B.    The Entwinement Doctrine

Although not cited in the Plaintiff's Complaint, Ms. Mason must be proceeding under 42 U.S.C. § 1983 in her First Amendment and Due Process claims.  As such, Ms. Mason must demonstrate that InterCoast was acting under color of state law, 42 U.S.C. § 1983, a concept that "is construed in harmony with the state action requirement of the Fourteenth Amendment." *Logiodice*, 296 F.3d at 26 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931-35 (1982)).  As the First Circuit explained, "[b]roadly speaking, the Fourteenth Amendment protects individuals only against government (leaving private conduct to regulation by statutes and common law)." *Id.* Eschewing other theories, Ms. Mason focuses her argument that there is sufficient state action to proceed against InterCoast under the so-called entwinement doctrine.

### 1.    *Brentwood Academy v. Tennessee Secondary School Athletic Association*

The seminal case on the entwinement doctrine is *Brentwood*, a 2001 decision of the United States Supreme Court. In *Brentwood*, the Supreme Court addressed "whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action when it enforces a rule against a member school." 531 U.S. at 290. The statewide association included most public schools in Tennessee, acted through their representatives, drew their officers from them, was largely funded by their dues and income received in their stead, and historically had been seen to regulate in lieu of the State Board of Education's exercise of its own authority. *Id.* at 290-91. In these circumstances, the *Brentwood* Court concluded that "the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being no offsetting reason to see the association's acts in any other way." *Id.* at 291. The Supreme Court observed that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

In concluding that the Association in *Brentwood* was sufficiently entwined with the state to meet the state action requirement, the Supreme Court pointed to a number of factors. *Id.* at 295-302. The Supreme Court noted that the Association in that case "is not an organization of natural persons acting on their own, but of schools, and of public schools to the extent of 84% of the total." *Id.* at 298. It also concluded

that the public school officials who were part of the Association were acting "within the scope of their duties when they represent their institutions." *Id.* at 299. It observed that "[i]nterscholastic athletics obviously play an integral part in the public education of Tennessee, where nearly every public high school spends money on competitions among schools." *Id.* The Association, the Court noted, is "an organization overwhelmingly composed of public school officials who select representatives (all of them public officials at the time in question here), who in turn adopt and enforce the rules that make the system work." *Id.* Furthermore, the Association's revenue came mostly from the public schools. *Id.* The public officials involved in the Association "do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms." *Id.* at 300. Finally, state board members of the Association sit ex officio on the board of control and legislative council and the Association's employees are deemed state employees for eligibility in the state retirement system. *Id.* The *Brentwood* Court concluded that "[e]ntwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards; entwinement to the degree shown here requires it." *Id.* at 302.

## 2. *Logiodice v. Trustees of Maine Central Institute*

In 2002, in *Logiodice*, the First Circuit expanded upon *Brentwood.* The case involved student discipline by Maine Central Institute (MCI), a privately operated high school, which contracted with Maine School Administrative District Number 53

to provide a high school education for students within the District. *Logiodice*, 296 F.3d at 24-25. The contract, which ran for ten-year intervals, required MCI to "accept and educate all of the school district's students in the ninth through twelfth grades in exchange for specified tuition payments by the school district." *Id.*

After discussing and discarding the public function test, *id.* at 26-27, the First Circuit turned to the entwinement doctrine as explained in *Brentwood*, which it characterized as stressing two points: "that the membership of the association was comprised overwhelmingly (84 percent) of 'public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling' and that in substance the association (replacing previous state school board regulation) set binding athletic standards for state schools, including the recruiting standards at issue in the case." *Id.* at 28 (quoting *Brentwood*, 531 U.S. at 299-301). The *Logiodice* Court discussed the following additional factors: (1) the state of Maine regulated MCI, (2) eighty percent of MCI's students were sponsored by the school district, (3) the school district contributed about half of MCI's budget, (4) MCI students were treated as if they were regular public school students, (5) MCI is run by private trustees, not public officials, (6) two officials of the school district (a school principal and a teacher) were trustees but served as private citizens, and (7) there was no entwinement relating to the imposition of discipline on students. *Id.*

The First Circuit also observed that the "Supreme Court has rejected any federal constitutional obligation on the state to provide education." *Id.* at 29 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973)). It conceded that

the public is often "dependent on private entities for crucial services and, in certain key areas, competition may not furnish protection." *Id.* at 30. It pointed to such examples as electric, gas, or bus service that may be "privately provided under franchise." *Id.* But the *Logiodice* Court stated that "[t]hus far, the Supreme Court has declined to impose due process requirements on such institutions." *Id.* at 30-31. Instead, the First Circuit noted that there are "state statutory and administrative remedies . . . normally available to deal with such abuses and that 'constitutionalizing' regulation of private entities is a last resort." *Id.* at 31.

### 3. InterCoast, Courtney Mason, and Entwinement

From this Court's perspective, the Supreme Court and First Circuit decisions in *Brentwood* and *Logiodice* doom Ms. Mason's claim that InterCoast was acting under color of state law or that it was a state actor in expelling her. Comparing the facts in *Logiodice* to the facts here, Ms. Mason's case for state action against InterCoast is much more attenuated than Mr. Logiodice's claim against MCI. First, InterCoast is a private-for-profit business. Unlike *Brentwood* and *Logiodice*, there is no evidence in this record that state officials are involved ex officio or even as private citizens with the governance and administration of InterCoast; no Maine government officials sit on InterCoast's board of directors or act as InterCoast employees. Nor, unlike *Brentwood*, are InterCoast's employees deemed state employees for any purpose.

Second, InterCoast's business is post-secondary education. As *Logiodice* observed, the Supreme Court has not recognized a constitutional obligation on the

state to provide education, and in *Logiodice*, the First Circuit addressed high school, not post-secondary, education. If there is no constitutional right to an education at high school, it follows that there is none after high school.

Third, unlike *Brentwood* where the Association controlled interscholastic high school athletics throughout Tennesse and *Logiodice* where MCI was the only high school in the student's school district, there is no evidence that InterCoast's Kittery Nursing School was the only nursing school that Ms. Mason could have attended either in the state of Maine or nearby in the state of New Hampshire. In *Logiodice*, the First Circuit made the point that "schooling, including high school education, is regularly and widely performed by private entities." 296 F.3d at 26-27. The same is true, even more so, with post-secondary nursing programs.

Fourth, unlike *Brentwood* and *Logiodice*, there is no evidence in this record that InterCoast ever held itself out as a state institution, a state surrogate institution, or treated the students as attending a state nursing school or, for that matter, that the students considered themselves as attending a state nursing school.

Fifth, unlike *Brentwood* and *Logiodice*, there is no evidence in this record that the state of Maine directly funds any of InterCoast's activities. In *Brentwood*, the Association was largely funded by public schools and in *Logiodice*, the school district contributed about half of MCI's revenue. Here, there is no evidence of any direct state support of InterCoast. Nor does the Court view the fact that some students received federally-guaranteed loans to pay for their InterCoast education as direct funding of the type discussed in *Brentwood* and *Logiodice*.

Ms. Mason's best argument is that the intensity and scope of the BON's regulatory control of InterCoast so entwines the BON in InterCoast's activities that it makes InterCoast a state actor. In InterCoast's reply, it relies on *Rendell-Baker*, a 1982 Supreme Court case, to assert that mere governmental regulation cannot meet the state action requirement. It is true, as *Rendell-Baker* demonstrates, that the Supreme Court has been reluctant to find that governmental regulation alone will suffice to constitute state action. However, *Rendell-Baker* is not persuasive because it is public function case and was decided before the Supreme Court announced the entwining concept in *Brentwood*. Indeed, in *Brentwood*, the Supreme Court discussed *Rendell-Baker* and distinguished it from the entwinement doctrine. *Brentwood*, 531 U.S. at 303 ("The Association argues that application of the public function criterion would produce the same result here, and we will assume, *arguendo*, that it would. But this case does not turn on a public function test, any more than *Rendell-Baker* had anything to do with entwinement of public officials in the special school"); *see Logiodice*, 296 F.3d at 27. Furthermore, the First Circuit in *Logiodice* noted that in *Brentwood*, the Supreme Court had observed that the Association had "set binding athletic standards for state schools including the recruiting standards at issue in the case." *Logiodice*, 296 F.3d at 28 (citing *Brentwood*, 531 U.S. at 300-01).

Even assuming that in a specific case, state regulations could theoretically be so tight and all-encompassing that in complying with them, a private actor could be acting under color of state law, this is not that case. The Court earlier quoted *Brentwood* as stating that "state action may be found if, though only if, there is such

a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood*, 531 U.S. at 295 (internal punctuation omitted). Here, there is no evidence that, in expelling Ms. Mason, InterCoast was acting in strict compliance with state requirements. To the contrary, as InterCoast points out, once Ms. Mason complained to the BON, the BON opened an investigation into her termination. Furthermore, the record confirms that in expelling Ms. Mason, InterCoast was acting pursuant to its own disciplinary procedures and no government officials were involved in the discipline process.

In short, the Court cannot conclude that in its actions against Ms. Mason, InterCoast was acting under color of state law under 42 U.S.C. § 1983 or as a state actor under constitutional law and thus, the Court concludes that InterCoast is entitled to summary judgment on Counts Four and Five.

### C. State Breach of Contract Count

InterCoast saved for its reply a demand that the Court dismiss the sole remaining count in this case, Count Two, the breach of contract count. *Def.'s Reply* at 1, 9. InterCoast made no mention of this requested relief in its original motion, *Def.'s Mot.* at 1-12, and in fact, InterCoast's only reference to Count Two in its original motion was to clarify that it was not moving for summary judgment on Count Two. *Id.* at 3. Accordingly, Ms. Mason has not had the opportunity to respond to InterCoast's demand for dismissal. *Pl.'s Opp'n* at 1-16.

The Court takes a dim view of InterCoast's holding back its requested dismissal of Count Two until its reply. The District's Local Rules expressly provide

that any reply memorandum "shall be strictly confined to replying to new matter raised in the objection or opposing memorandum." D. ME. LOC. R. 7(c). InterCoast has committed another violation of the local rules. For this reason alone, the Court deems the requested relief waived.

Moreover, InterCoast's entire argument for dismissal of the state law claim consists of one sentence: "Consequently, this Court should grant Summary Judgment as to Counts IV and V, and dismiss the remaining Breach of Contract Action as a state law claim without continuing jurisdiction of this Court." *Def.'s Reply* at 9. Intercoast cites no authority for its demand and performs no analysis. *See United States v. Flores-Rivera*, 787 F.3d 1, 29-30 (1st Cir. 2015) ("[A]rguments raised in only a perfunctory and undeveloped manner are deemed waived") (quoting *United States v. Sevilla-Ovola*, 770 F.3d 1, 13-14 (1st Cir. 2014)).

To be clear, the Court would not grant InterCoast's request even if it had been properly raised and argued. The Court suspects that InterCoast is taking its cue from *Logiodice*, where the district court dismissed the remaining state law claim after dismissing the federal claims. *Logiodice v. Trs. of Me. Cent. Inst.*, 170 F. Supp. 2d 16, 34 (D. Me. 2001). The district court noted that it had the discretion to retain or dismiss the remaining state law claims. *Id.* (citing 28 U.S.C. § 1367(c)). The First Circuit upheld the district court's exercise of discretion. *Logiodice*, 296 F.3d at 32.

This case is different. In *Logiodice*, the student was a resident of Maine and MCI was a Maine corporation, therefore the district court had jurisdiction of the state law claims only under its supplemental jurisdiction authority. *See* 28 U.S.C. §

1367(a).  Once the federal claims were dismissed, the district court could decline to exercise supplemental jurisdiction over the purely state law claims.  § 1367(c)(3).

Here, the Complaint alleges that Courtney Mason is a resident of Rochester, New Hampshire and that InterCoast is a California-based business.  *Compl.* ¶¶ 1-2. Ms. Mason alleged that this Court has jurisdiction "based on diversity and subject matter."  *Id.* ¶ 3.  The Complaint therefore alleges sufficient facts for the Court to conclude the lawsuit is "between citizens of different states."  28 U.S.C. § 1332(a)(1). It is true that Ms. Mason has not alleged a specific dollar amount, but in claiming that the Court has diversity jurisdiction, the Court infers that she contends "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  § 1332(a).  Therefore, the Court concludes it has original, not supplemental jurisdiction over this civil action.

Even if the Court's jurisdiction were only supplemental, the Court in this exercise of discretion would retain this case.  The case has been pending for over two years and should be ready for trial immediately.  The Court sees no useful purpose in forcing Ms. Mason to state court to start all over again.

## V.    CONCLUSION

The Court GRANTS InterCoast Career Institute's Motion for Summary Judgment (ECF No. 71) as to Counts Four and Five of Plaintiff's Complaint.  The Court DENIES Defendant's Objections to Plaintiff's Evidence Contained in Plaintiff's Opposition to Motion for Summary Judgment (ECF No. 81).  The Court ORDERS that this case be placed on the next available trial list.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of January, 2017